IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NIKE, INC., an Oregon corporation, | ) | 2:05-cv-1468-GEB-JFM |
| Plaintiff, | ) | |
| v. | ) | AMENDED FINDINGS OF FACT |
| | ) | AND CONCLUSIONS OF LAW[*] |
| NIKEPAL INTERNATIONAL, INC., a California corporation, | ) | |
| | ) | |
| Defendant. | ) | |

The following findings of fact and conclusions of law issue as a result of a bench trial conducted in this trademark action. Plaintiff Nike, Inc. ("Nike"), a company headquartered in Beaverton, Oregon which uses the mark NIKE, contests the use of the mark NIKEPAL by Defendant Nikepal International, Inc. ("Nikepal"), a company located in Sacramento, California.  Nike initially contested Nikepal's registration of the NIKEPAL mark at the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("PTO"); however, the TTAB denied Nike's opposition to Nikepal's

---

[*]     This order amends and supersedes the order filed September 10, 2007.

registration of the NIKEPAL mark.  Nike subsequently appealed the

TTAB's ruling to this court under 15 U.S.C. § 1071 and brought

additional claims for federal and state trademark dilution under 15

U.S.C. § 1125(c) and California Business and Professions Code section

14330; for trademark infringement under 15 U.S.C. § 1114; and for

unfair competition under 15 U.S.C. § 1125(a).[2]

Nike seeks an injunction preventing Nikepal from using the

term "Nike" (or any term confusingly similar thereto) alone or as part

of any trademark, domain name or business name under which Nikepal

offers goods or services in commerce.  Nike also seeks a reversal of

the TTAB's ruling allowing Nikepal to register the NIKEPAL mark.

Nikepal seeks an affirmation of the TTAB's April 21, 2005 order.

(TTAB's April 21, 2005 Order ("TTAB Decision").)

<u>Findings of Fact</u>

<u>I. The Parties and their Businesses</u>

<u>A. Nike</u>

Nike was incorporated in 1968 under the original company

name Blue Ribbon Sports.  (Exs. 44, 57 at 1.)  In 1971, it adopted the

NIKE mark to brand its footwear products and in May 1978, the

company's name was officially changed to "Nike, Inc."  (Joint Pretrial

Statement Undisputed Fact #2; Ex. 44.)  Today, Nike is the largest

seller of athletic footwear and apparel in the world.  (Ex. 47 at 2.)

Nike sells around 180 million pairs of shoes annually in the United

States alone.  (Trial Transcript ("Tr.") at 83:19-23.)  Nike's

principal business activity is the design, development, and worldwide

---

[2]   For the reasons stated herein, Nike prevails on its federal
and state dilution claims.   Therefore, Nike's claims for trademark
infringement and unfair competition need not be reached.

marketing and distribution of high quality and technologically
advanced footwear, apparel, equipment, and accessories. (Ex. 47; Tr.
at 21:9-22; 22:2-8.) Nike has continuously used the NIKE mark on and
in connection with the various products offered by the company since
the 1970s. (Exs. 2-4, 7, 14; Tr. at 19:3-6, 43:10-44:15.) Sometimes,
the word mark NIKE is the only brand used; sometimes, Nike's Swoosh
design mark (i.e. the logo which frequently appears on products along
with NIKE, and in some instances alone) is also placed on the product.
(Tr. at 121:4-9.)

        B. Nikepal

        Nikepal was incorporated on May 18, 1998 by the company's
founder and president, Palminder Sandhu ("Mr. Sandhu"), who then began
using the NIKEPAL mark in commerce. Nikepal provides services and
products to analytical, environmental, and scientific laboratories.
(Tr. at 180:14-20.) Nikepal's trademark application to the PTO
requested registration for: "import and export agencies and wholesale
distributorships featuring scientific, chemical, pharmaceutical,
biotechnology testing instruments and glassware for laboratory use,
electrical instruments, paper products and household products and
cooking appliances." (Application Serial No. 76123346, filed
September 6, 2000; see TTAB Decision at 1.) Nikepal distributes glass
syringes in varying volumes and other laboratory products to testing
and power companies and also distributes paper boxes (syringe carrying
cases) and nylon valves and caps for use with the syringes. Nikepal
only distributes its products to laboratories, not to individuals.

        Nikepal does not have a retail office, but operates its
business through its website (located at www.nikepal.com), via email,
and via telephone. (Tr. at 189:17-190:2, 378:11-12; Ex. 98; Tr. at

142:16-143:10.)  Nikepal is run by Mr. Sandhu, who also works as a transportation engineer.  (Tr. at 125:9-17.)  Currently, Nikepal has one other part-time employee.  (Tr. at 202:15-22.)  Nikepal has only a few hundred customers, but it has a list of thousands of prospective customers, some of whom receive materials from Nikepal advertising its product and service offerings under the mark NIKEPAL.  (Tr. at 417:8-12; Ex. 147.)

II. The Parties' Marks

   A. NIKE

   Nike first registered the NIKE mark with the PTO in February 1974.  (Ex. 2.)  Nike owns ten (10) federal trademark registrations for the NIKE mark alone, covering footwear, clothing, bags, timepieces, paper products such as notebooks and binders, sport balls, swim accessories, and retail store services, all of which related to pre-May 1998 uses of the mark.  (Exs. 2, 3, 4, 7, 14, 24, 26, 28, 31, 35.)  By May 1998, Nike was also using and applied for trademark registrations covering the use of the NIKE mark in combination with other terms or designs for footwear, clothing, bags, timepieces, posters, sport balls, swim accessories, weights, gloves, headgear, and retail store services.  (Exs. 5, 6, 15-23, 25, 27, 29, 30, 32-34, 36.)  For example, Nike owns nineteen (19) federal registrations for NIKE composite marks such as: NIKE and the Swoosh design which has been in use since 1971; NIKE AIR which has been in use since 1987; NIKE-FIT which has been in use since 1990; NIKE TOWN which has been in use since 1990; NIKE SHOP which has been in use since 1991; and NIKE GOLF which has been in use since 1993.  (Id.)  From 1998 to the present, Nike has continued to use the mark NIKE alone and in combination with other terms or designs.  (Exs. 37, 39, 40.)

B. NIKEPAL

Mr. Sandhu testified that he conceived of the term Nikepal when he wanted to create a vanity license plate for his car.  (Tr. at 373:17-25.)  He testified that he selected the word "Nike" by opening a dictionary to a random page and choosing the first word he saw, and then combined it with the first three letters of his first name "Pal." (Tr. at 372:8-13, 373:1-6, 374:4-12.)  "Pal" means friend or benefactor.  (Record from the TTAB Proceeding ("TTAB Rec."), Dep. of Palminder Sandhu ("Sandhu Dep.") at 9:12-16; Tr. at 127:24-128:6.) Mr. Sandhu admits he knew of the existence of the company Nike and its use of the NIKE mark at the time he devised the term NIKEPAL.  (Tr. at 127:20-23.)  Despite Mr. Sandhu's trial testimony concerning the manner in which he conceived of the term NIKEPAL, the court does not find it to be credible.

The "Nike" portion of the NIKEPAL mark is pronounced the same way as the NIKE mark is pronounced: with a hard "i" (like bike) in the first syllable and a hard "e" (like in "key") in the second syllable.[3]  (Tr. at 296:1-17; Ex. 414.)  The articles of incorporation signed by Mr. Sandhu for Nikepal in 1998 display the company name as "NikePal International, Inc.," with the first word of the company name

---

[3]     Nikepal's attorney attempted to convince the court that there is a pronunciation difference between NIKE and NIKEPAL.  In her questions during trial, for example, she pronounced Nikepal's mark as "nik-a-pal."  However, in answering her questions at trial, Mr. Sandhu, the president of Nikepal, alternated between the pronunciation of NIKEPAL as "nik-a-pal" and as "Ny-key-pal."  Further, Nike's witness, Joseph Sheehan, a former FBI agent and now a private investigator, provided a tape recording of the outgoing message heard on Nikepal's answering machine which clearly pronounced the term "Nike" with long, or hard, vowels, that is an "i" like in "bike" and "e" like in "key" identical to the pronunciation of the Nike's trademark.

1  spelled "NikePal," with a capital "N" and a capital "P."[4]  (Tr. at

2  126:7-127:3; Ex. 154.)

3         In addition to using Nikepal as the company name, NIKEPAL

4  appears directly on some of Nikepal's products, including on its

5  syringe products, and on its marketing materials.  (Tr. at 128:7-11;

6  Ex. 127; Tr. at 135:25-136:20, at 136:21-137:7, 137:20-138:4.)

7  Nikepal also places www.nikepal.com on its syringes to identify the

8  source of the syringe.  (Tr. at 138:5-9.)  Nikepal also uses the

9  NIKEPAL mark in a vanity phone number (1-877-N-I-K-E-P-A-L), on its

10 website, and in its domain names, including nikepal.com, nikepal.biz,

11 nikepal.us, nikepal.tv, nikepal.info, and nikepal.net.  (Tr. at

12 128:12-129:9, 144:11-16.)

13 III. Nike's Sales

14        By the late 1980s, United States sales of NIKE branded

15 products were over one billion dollars per year.  (TTAB Rec., Dep. of

16 John F. Coburn ("Coburn Dep."), Ex. 28.)  Starting in 1991 and through

17 the mid 1990s, sales of NIKE products in the United States were

18 approximately two billion dollars per year, and were above five

19 billion dollars per year by 1997.[5]  (Id.; Tr. at 76:3-23; Ex. 61 at p.

20 _____

21        [4]    However, since both parties refer to "Nikepal" with a
   lowercase "p" in this action, the court adopts this spelling for the
22 purposes of this order.

23        [5]    Nikepal has disputed whether Nike's total sales previously
   testified to by Mr. Coburn in the TTAB proceeding were all attributable
24 to NIKE, arguing that some of those sales included products that did not
   bear the NIKE mark.  However, Mr. Farris, a high-level Nike employee who
25 has been with the company since 1973, testified that the only portion of
   Nike sales that could potentially be for products bearing a mark other
26 than NIKE would have been for the Cole Haan brand which was less than
   one percent of total United States sales in the 1990s.  (Tr. 76:20-23.)
27 This is also shown by Nike's 10K SEC filings.  Therefore, the trial
   evidence clearly established that Nike's annual sales of NIKE products
28                                                              (continued...)

10; Ex. 59 at p. 2.)  By 1997, Nike was the largest seller of athletic footwear and apparel in the world.  (Ex. 57; Tr. at 84:11-25.)  The geographic area of Nike's sales includes the United States and 140 countries throughout the world.  (TTAB Rec., Coburn Dep. at 18:9-14; Ex. 61 at 2.)  Since 1997, Nike has sold over 100,000,000 pairs of NIKE shoes each year.  (Tr. at 84:6-8.)

IV. Advertising and Promotion of the NIKE Mark

Nike has undertaken significant expense to promote the NIKE mark.  (See Ex. 70 at 33.)  Nike advertises in various types of media, including traditional print advertising, such as magazines (of both special and general interest), newspapers (of general circulation), leaflets, and billboards.  (TTAB Rec., Coburn Dep. at 19:19-25, 20:4-13, 34:1-25.)  Nike also advertises in electronic media, including radio, television, cable and internet, on sides of buildings, on taxi cabs, and through direct mailings.  (Id.)  Nike's television advertisements have run on network channels and have reached national audiences.  (Tr. at 56:8-25, 60:10-61:19, 62:10-63:25, 64:16-65:9, 69:21-70:25.)  Nike has also promoted its mark by associating with athletes through endorsement arrangements. (Tr. at 66:18-20; TTAB Rec., Coburn Dep. at 20:19-21:8.)  By 1991, Nike was spending in excess of one hundred million dollars per year in the United States alone to advertise products bearing the NIKE mark. (TTAB Rec., Coburn Dep. Ex. 30.)  By 1997, Nike had spent at least $1,567,900,000.00 to promote the NIKE mark in the United States. (Id.)

---

[5](...continued)
in the United States exceeded billions of dollars prior to May 1998.

V. Notoriety of NIKE

         The NIKE mark has been consistently ranked as a top brand in publications that survey the top brands each year.  (Ex. 112 (at NIKE04099); Ex. 113 (at NIKE04104); Ex. 121 (at NIKE04159); Ex. 122 (at NIKE04174).)  Since at least 1990, Nike has been named one of the top forty (40) brands in the United States based on the EquiTrend and other studies published in BrandWeek and Financial World Magazine.  (Id.)  Other brands ranked in such studies include FRITO LAY, LEVI'S, CAMPBELLS', HEWLETT-PACKARD, SONY, PEPSI, and VISA.  One story printed in Forbes magazine, reported a survey conducted by Young & Rubicam that ranked the NIKE brand among the top ten (10) in the United States in 1996 with COKE, DISNEY, and HALLMARK.  (Tr. at 80:7-16.)

VI. Evidence of Actual Association

         A survey conducted by Phillip Johnson of Leo J. Shapiro and Associates ("Mr. Johnson's survey"), a Chicago-based market research firm, determined that a significant number of Nikepal's potential laboratory customers actually associated NIKE with NIKEPAL.  Mr. Johnson is an expert at designing surveys that measure consumer behavior.  (Tr. at 302:24-303:7.)  The primary business of Shapiro and Associates is to explore consumer behavior through the use of surveys for businesses such as Toys-R-Us, Target, and Petsmart in order to help them better understand their marketplace when developing new retail concepts.  (Tr. at 298:16-21.)  Nike retained Mr. Johnson to design a survey to measure, inter alia, the likelihood of dilution of the NIKE brand as a result of Nikepal's use of the NIKEPAL mark.  (Tr. at 304:18-25.)

         In designing his study, Mr. Johnson used a universe of survey participants randomly selected from lists of companies that Mr.

Sandhu's deposition testimony identified as the sources for Nikepal's current and prospective customers.  (Tr. at 309:3-18.)  Mr. Johnson conducted the survey by phone and asked respondents about their perception of a website called nikepal.com.  In designing his survey, Mr. Johnson chose one of the ways that the NIKEPAL mark is used in commerce which allowed him to reasonably recreate a purchasing context while obtaining a controlled and accurate measurement.  (Tr. at 312:25-314:22.)  Mr. Johnson testified that this survey replicated the circumstances in which people typically encountered the NIKEPAL mark. (Tr. at 311:19-312:16, 367:8-17.)

Once survey respondents were screened to confirm that they were the persons most responsible for ordering laboratory equipment at their business, they were asked: "What if anything, came to your mind when I first said the word Nikepal?"  Many survey respondents who were not actually confused about the source of the Nikepal website nonetheless identified Nike.  Mr. Johnson testified that his survey revealed that the vast majority of respondents, 87%, associated Nikepal with Nike; that is, when they encounter the mark NIKEPAL, they think of Nike and/or its offerings.  (Tr. at 324:3-325:23, 326:19-24.)

Evidence of actual association of the NIKEPAL mark with the NIKE mark also exists beyond the results demonstrated in Mr. Johnson's survey.  Mr. Sandhu registered the domain names nikepal.biz, nikepal.us, nikepal.tv, nikepal.net, and nikepal.info with Network Solution, and until just prior to trial, those websites were inactive. Mr. Sandhu testified that at the time he registered those domains he chose not to link them to an active website.  (Tr. at 130:8-131:2, 131:17-19.)  As a result, Network Solutions assigned those domains an "under construction" page and then associated with that page

promotions and advertisement links to product and service offerings of
its choice.  (Ex. 443; Tr. at 232:21-233:9.)  These promotions and
advertisements all referred to NIKE products or those of one of its
competitors.  (Ex. 434; Tr. at 210:25, 213:6-8, 214:7-12, 214:19-21,
216:22-25; Ex. 438; Tr. at 218:11-13; Ex.440; Tr. at 219:1-3, 219:4-5,
219:17-19; Ex. 442; Tr. at 219:14-16, 235:12-15.)  Thus, when
accessing Nikepal's NIKEPAL domain names (other than nikepal.com),
users received information about Nike or its competitors, but not
Nikepal.  (Id.)

Conclusions of Law

I. Dilution

Under the Federal Trademark Dilution Revision Act[6]:

> [T]he owner of a famous mark that is distinctive,
> inherently or through acquired distinctiveness,
> shall be entitled to an injunction against another
> person who, at any time after the owner's mark has
> become famous, commences use of a mark or trade
> name in commerce that is likely to cause dilution
> by blurring or dilution by tarnishment of the
> famous mark, regardless of the presence or absence
> of actual or likely confusion, of competition, or
> of actual economic injury.

15 U.S.C. § 1125(c)(1) ("TDRA").  To prevail on its dilution claim,
Nike must prove 1) that its mark was famous as of a date prior to the
first use of the NIKEPAL mark and 2) that Nikepal's use of its

---

[6]   The TDRA, signed into law on October 6, 2006, amended the
previous federal anti-dilution statute (the Federal Trademark Dilution
Act ("FTDA")).  The TDRA revises the FTDA in three ways: it establishes
that likelihood of dilution, and not actual dilution, is a prerequisite
to establish a dilution claim; it sets forth four relevant factors
courts may consider in determining famousness; and it also lists six
relevant factors that courts may consider in determining whether a
likelihood of dilution exists.  Century 21 Real Estate LLC v. Century
Surety Co., 2007 WL 433579, at *1 (D. Ariz. Feb. 6, 2007).

allegedly diluting mark creates a likelihood of dilution by blurring or tarnishment.[7]

### A. Whether NIKE Was Famous Prior to the First Use of NIKEPAL

A "famous" mark is one that "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

> In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.

---

[7] California's anti-dilution statute, under which Nike also brings a claim, prescribes:

> Likelihood of injury to business reputation or a dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between parties or the absence of confusion as to the source of goods or services.

Cal. Bus. & Prof. Code § 14330.

If Nike prevails on its federal dilution claim, it will also prevail on its dilution claim under California law. See Jada Toys, Inc. v. Mattel, Inc., 2007 WL 2199286, at *4 (9th Cir. Aug. 2, 2007); see also Panavision Int'l v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998) ("[Plaintiff's] state law dilution claim [under California Business and Professions Code section 14330] is subject to the same analysis as its federal [dilution] claim.").

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Id.  Since Nikepal's first use of NIKEPAL commenced in May 1998, Nike must show that NIKE was famous before that date.

With regard to the first factor, the evidence clearly establishes that through various combinations of athlete endorsements, television, radio, print media, and billboard placements, NIKE was promoted nationally for more than two decades before 1998.  By the 1990s, Nike was had spent in excess of a billion dollars for promotion of NIKE products in the United States.

With regard to the second factor, Nike's sales of NIKE products reached the billion dollar per year level in the United States well before May 1998.  By 1997, Nike had spent in excess of one billion dollars to promote the NIKE mark in the United States.

Nike also satisfies the third factor, since recognition of the success of NIKE has been recorded by various publications in surveys and articles written prior to May 1998.  Since the early 1990s, NIKE has been consistently ranked as a top brand in brand surveys in the United States and the world.  Mr. Johnson, who in his professional capacity is familiar with the reputation and methodology used in various brand surveys and literature, opined that these sources evinced that NIKE was famous during the mid 1990s, before Nikepal adopted its mark in 1998.  Nikepal counters that only Nike's Swoosh design mark, and not the NIKE mark itself, is famous.  However, Mr. Johnson's survey revealed that when participants were exposed solely to the word "Nike" without the Swoosh, the response overwhelmingly indicated recognition of the NIKE mark.

1  Finally, with regard to the fourth factor, the NIKE mark is
2  registered on the PTO's principal register.  Nike owns ten (10)
3  federal registrations for NIKE covering uses prior to 1998 which
4  include retail services, bags, footwear, apparel, heart monitors,
5  electrical items and paper products.  Accordingly, the court concludes
6  that NIKE was famous under 15 U.S.C. § 1125(c)(2)(A), prior to
7  Nikepal's first use of the NIKEPAL mark.

8  <u>B. Likelihood of Dilution by Blurring</u>

9  The TDRA defines dilution by blurring as an "association
10 arising from the similarity between a mark or trade name and a famous
11 mark that impairs the distinctiveness of the famous mark."  15 U.S.C.
12 § 1125(c)(2)(A).

13 In determining whether a mark or trade name is
   likely to cause dilution by blurring, the court
14 may consider all relevant factors, including the
   following:

15

16 (i) The degree of similarity between the mark or
   trade name and the famous mark.

17 (ii) The degree of inherent or acquired
   distinctiveness of the famous mark.

18

19 (iii) The extent to which the owner of the famous
   mark is engaging in substantially exclusive use of
   the mark.

20

21 (iv) The degree of recognition of the famous mark.

22 (v) Whether the user of the mark or trade name
   intended to create an association with the famous
   mark.

23

24 (vi) Any actual association between the mark or
   trade name and the famous mark.

25 <u>Id.</u>

26

27

28

13

<u>(i) The Degree of Similarity</u>

Marks in a dilution analysis must be "identical" or "nearly identical."[8]   <u>Thane Int'l, Inc. v. Trek Bicycle Corp.</u>, 305 F.3d 894, 906 (9th Cir. 2002).  "For marks to be nearly identical to one another, they 'must be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same.'"  <u>Playboy Enters., Inc. v. Welles</u>, 279 F.3d 796, 806 n. 41 (9th Cir. 2002)(internal citation omitted).

The parties' marks are nearly identical.  The NIKEPAL mark is a composite of the word "Nike" with the term of affinity, "pal." The composite nature of the NIKEPAL mark is evident in the logo selected by the company which clearly features an "N" and a "P."  In each case the dominant feature of the mark is the term "Nike."  In addition, the term "Nike" in both marks is pronounced identically with an "i" like in "bike" and an "e" like in "key."  <u>See</u> <u>Porsche Cars N. Am., Inc.</u>, 2000 WL 641209, at *3, (finding that the trademark PORSCHE was diluted by PORCHESOURCE.COM); <u>see also</u> <u>Jada Toys, Inc.</u>, 2007 WL 2199286, at *4 (concluding "that a reasonable trier of fact could find that the HOT WHEELS and HOT RIGZ marks are nearly identical.").

Further, as shown by Mr. Johnson's survey, the vast majority of the survey respondents, representing a significant segment of Nikepal's target customer group, associate Nike and/or its products and services when they encounter the mark NIKEPAL, thus perceiving the

---

[8]   Nike argues that the TDRA does not require that the marks be identical or nearly identical.  However, the enactment of the TDRA did "not eliminate the requirement that the mark used by the alleged diluter be 'identical,' or 'nearly identical,' or 'substantially similar,' to the protected mark."  <u>Century 21 Real Estate LLC</u>, 2007 WL 433579, at *2 (citing House Report on Trademark Dilution Act of 2005 at 8, 25).

two marks as essentially the same.  <u>See</u> <u>Thane Int'l, Inc.</u>, 305 F.3d at 906 ("The marks must be of sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an association with the senior.") (citing <u>Nabisco, Inc. v. PF Brands</u>, 191 F.3d 208 (2d Cir. 1999)).  Accordingly, this factor favors Nike.

<u>(ii) Distinctiveness</u>

"'There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful.'" <u>Quicksilver, Inc. v. Kymsta Corp.</u>, 466 F.3d 749, 760 (9th Cir. 2006) (internal citations omitted).  "[S]uggestive, arbitrary, and fanciful marks are 'deemed inherently distinctive and are automatically entitled to [trademark] protection because they naturally serve to identify a particular source of a product.'"  <u>Id.</u>  Suggestive marks require the use of imagination to make a connection between the mark and an attribute of the goods or services to which it is applied. <u>Official Airlines Guides, Inc. v. Goss</u>, 6 F.3d 1385, 1391 (9th Cir. 1993).

Nikepal does not dispute that NIKE is, at the very least, suggestive. (<u>See</u> Nikepal's Proposed Findings and Recommendations at 42 ("[Nike's] mark is suggestive when used in connection with Plaintiff's products.").)  Accordingly, NIKE is inherently distinctive and this factor favors Nike.

<u>(iii) Substantially Exclusive Use</u>

The law does not require that use of the famous mark be absolutely exclusive, but merely "substantially exclusive." <u>See</u> <u>L.D.Kichler Co. v. Davoil Inc.</u>, 192 F.3d 1349, 1352 (Fed. Cir. 1999) (holding that in the trademark context, "substantially exclusive" use does not mean totally exclusive use).  Therefore, a limited amount of

third party use is insufficient to defeat a showing of substantially

exclusive use.  See Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 878

(9th Cir. 1999) (finding that use of the mark was not substantially

exclusive when the words "Avery" and "Dennison" were "*commonly* used as

trademarks, both on and off of the Internet, by parties other than

Avery Dennison." (emphasis added)).

Nike asserts that its use of the NIKE mark is substantially

exclusive.  Nikepal introduced evidence of use of the term "Nike" in

the company name "Nike Hydraulics, Inc.," through a bottle jack

purchased from the company and a 1958 trademark registration for

"Nike" owned by Nike Hydraulics.[9]  However, this evidence is

insufficient to disprove Nike's claim that its use of NIKE is

substantially exclusive.  Even Nikepal's witness, Roger Smith,

admitted that he had not encountered Nike Hydraulics before hearing

that name in connection with this action.  Accordingly, the court

finds that Nike's use of the NIKE mark is substantially exclusive and

this factor therefore favors Nike.[10]

---

[9]      While a trademark registration owned by one of the *parties* in
a trademark lawsuit may be prima facie evidence of the facts contained
therein, the introduction of a trademark registration of a non-party to
a lawsuit does not provide evidence of any of the recorded information,
including date of first use.  See 15 U.S.C. § 1057(b); see also AMF Inc.
v. Am. Leisure Prod., Inc., 474 F.2d 1403, 1406 (C.C.P.A. 1973) (finding
that third-party registrations are "not evidence of what happens in the
market place" nor are they evidence of consumer familiarity with the
mark).

[10]      Nikepal also introduced evidence that the term "Nike" appears
in dictionaries referring to the Greek goddess of victory, that the
image of Nike the goddess appeared on some Olympic medals, and that the
United States Government named one of its missile programs "Nike."
However, Nikepal did not show that these uses were made in commerce in
association with the sale or marketing of goods or services as required
under the TDRA.  (See 15 U.S.C. § 1125(c)(1) (providing that under the
TDRA, only "use of a mark or trade name in commerce" is actionable as
(continued...)

1                     <u>(iv) Degree of Recognition</u>

2         The degree of recognition of NIKE is quite strong.  Millions

3 of NIKE products are sold in the United States annually and the

4 evidence demonstrates that NIKE is readily recognized.  This factor

5 therefore favors Nike.

6                <u>(v) Intent to Create Association</u>

7         Mr. Sandhu admitted that he was aware of the existence of

8 the NIKE mark before he adopted the company name.  Although he

9 testified at trial that he came up with the term Nikepal by opening

10 the dictionary to a random page and essentially finding that word by

11 "fate," his testimony was not credible.  (<u>See</u> Tr. at 372:8-13, 373:1-

12 6.) Therefore, this factor favors Nike.

13                  <u>(vi) Actual Association</u>

14         Nikepal registered the domain names nikepal.biz,

15 nikepal.net, nikepal.us, nikepal.info and nikepal.tv.  The evidence

16 shows that the domain registrar assigned the domain names an "under

17 construction" page and then associated with that page promotions and

18 advertisement links to a number of web pages that offered NIKE

19 products (or products of Nike's competitors in the shoe and apparel

20 field).  Thus, in the internet context, there is actual association

21 between NIKEPAL and NIKE.

22         Further, Mr. Johnson's survey also evinced that there is a

23 strong degree of association between NIKEPAL and NIKE.  Mr. Johnson's

24 survey showed over 87% of the people in Nikepal's own customer pool

25 associated the stimulus "Nikepal" with NIKE.  The survey presents

26 ample proof of association between the marks to support a finding that

27

28      [10](...continued)
diluting a famous mark.).)

1  such exists in the general public.  Accordingly, the court finds that

2  there is actual association between the NIKEPAL and NIKE marks and

3  this factor favors Nike.

4          In conclusion, since the six factors considered in the

5  likelihood of dilution analysis favor Nike, there is a likelihood that

6  NIKE will suffer dilution if Nikepal is allowed to continue its use of

7  NIKEPAL.  Accordingly, Nike prevails on its federal and state dilution

8  claims.

9  II. Permanent Injunction

10         Nike seeks an injunction for violation of the TDRA pursuant

11  to 15 U.S.C. § 1116(a).  To establish entitlement to an injunction,

12  Nike must show that: it has suffered an irreparable injury; that

13  remedies available at law, such as monetary damages, are inadequate to

14  compensate for that injury; that considering the balance of hardships

15  between Plaintiff and Defendant, a remedy in equity is warranted; and

16  that the public interest would not be disserved by a permanent

17  injunction.  eBay Inc. V. MercExchange, L.L.C., 126 S. Ct. 1837, 1839

18  (2006).

19         With regard to irreparable harm, if relief is not granted to

20  Nike under its dilution claim, it will face an escalating erosion of

21  its famous mark and NIKE will lose its ability to serve as a source-

22  identifying mark.  Further, there is no adequate remedy at law because

23  monetary damages will not compensate for this harm.

24         The balance of hardships also points in Nike's favor.

25  Although Nikepal will have to choose another name, Nikepal chose to

26  use the NIKEPAL mark with full awareness of the existence and

27  widespread use of the NIKE mark.  Further, given that Nikepal's

28

business is still relatively small, it should not be unduly burdensome

for it to notify its customers of its name change.

Finally, the public interest will not be disserved by the

issuance of a permanent injunction against Nikepal.  By preventing

dilution of NIKE, the public can continue to rely on the NIKE mark

serving its source designating function.  Accordingly, Nike's request

for an injunction against Nikepal for the use of the NIKEPAL mark is

granted.

III. Reversal of TTAB Decision

Finally, Nike seeks reversal of the TTAB's decision denying

its opposition to the registration of the NIKEPAL mark.  (TTAB

Decision at 16.)  Specifically, the TTAB held there was no likelihood

of dilution based on its finding that the parties' marks were not

sufficiently similar.  (Id. at 15-16.)

> [T]he Lanham Act provides two avenues for review
> of TTAB decisions: review by the Federal Circuit
> on the closed record of the TTAB proceedings . . .
> or review by the district court with the option of
> presenting additional evidence and raising
> additional claims . . . .  In the latter scenario,
> the district court sits in a dual capacity.  It is
> an appellate reviewer of facts found by the TTAB
> and is also a fact-finder based on new evidence
> introduced to the court.  Although the district
> court's review of the TTAB's decision is
> considered de novo when the parties present new
> evidence and assert additional claims, the
> district court also must afford deference to the
> fact findings of the TTAB.

CAE, Inc. v. Clean Air Eng'q, Inc., 267 F.3d 660, 674 (7th Cir. 2001).

Here, Nike presented new evidence in the form of, inter

alia, Mr. Johnson's survey showing that the vast majority of the

survey respondents, representing a significant segment of Nikepal's

target customer group, associate Nike and/or its products and services

when they encounter NIKEPAL, thus perceiving the two marks as

essentially the same.  <u>See</u> <u>Thane Int'l, Inc.</u>, 305 F.3d at 906 ("The marks must be of sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an association with the senior.") (citing <u>Nabisco, Inc.</u>, 191 F.3d at 208); <u>see also</u> <u>Playboy Enters., Inc.</u>, 279 F.3d at 806 n.41 (holding that "[f]or marks to be nearly identical to one another, they 'must be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same.'").  The new evidence submitted by Nike therefore compels a contrary finding on the similarity of the parties' marks.[11]

Accordingly, although the court gives deference to TTAB's fact-finding, the evidence presented by Nike in this action compels reversal of the TTAB's decision dismissing Nike's opposition to the registration of Nikepal's mark.

Therefore, the TTAB ruling is reversed and Nike's request for an order sustaining the opposition to Nikepal's registration for the NIKEPAL mark is granted.

-------

[11]   Further, Mr. Johnson's survey is also relevant on the issue of whether consumers presented with the NIKEPAL mark actually associate it with NIKE, a factor that the TTAB acknowledged was relevant to the dilution analysis but on which it did not make any finding.  <u>See</u> TTAB Decision at 15 ("In determining whether the mark will be diluted, the [TTAB] looks to the similarity of the marks, the renown of the party claiming fame and *whether purchasers are likely to associate two different products and/or services with the mark* even if they are not confused as to the different origins of the products and/or services.") (emphasis added)).

As to the other dilution factors that the TTAB did not make findings on (e.g., whether Nike is engaging in substantially exclusive use of its mark, whether NIKE is distinctive, the degree of recognition of the NIKE mark, and whether Nikepal intended to create an association with NIKE), the court's findings of fact and conclusions of law made above apply with equal force here.

<u>CONCLUSION</u>

For the reasons stated, Nike prevails on its federal and state dilution claims, the decision of the TTAB is reversed, and the opposition to Nikepal's registration of the NIKEPAL mark is sustained. Further, Nikepal is permanently enjoined from using NIKEPAL in connection with the offering of goods or services in commerce, including its use in domain names, on web pages, in printed matter, and on products, and shall cease any such uses of NIKEPAL within sixty (60) days of the date on which this order is filed.  Nikepal may continue to use its numeric telephone number, but may not advertise or associate it with the designation "1-877-NIKEPAL."

IT IS SO ORDERED.

Dated:  September 17, 2007

_____
GARLAND E. BURRELL, JR.
United States District Judge

21